UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 1:23-CR-00020-H-BU-1 |
| | ) |
| TERRELL CHARLES FRYAR, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |


ELECTRONICALLY-RECORDED ARRAIGNMENT/DETENTION HEARING
BEFORE THE HONORABLE JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE
JULY 13, 2023
ABILENE, TEXAS


FOR THE PLAINTIFF:

    STEPHEN RANCOURT
    UNITED STATES ATTORNEY'S OFFICE
    500 Chestnut Street, Suite 601
    Abilene, TX  79602
    (325) 271-6700


FOR THE DEFENDANT:

    MARK A. HOAK
    LAW OFFICE OF MARK A. HOAK
    1307-b West Abrams Street, Suite 211
    Arlington, TX  76013
    (817) 740-8900


    Proceedings recorded electronically; transcript produced by
computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

1                              **INDEX**

2     Defense
      Witnesses:          Direct      Cross      Redirect      Recross

3

4     DYLAN FRANTZ          21          29

5

6                            **EXHIBITS**

7

8     Government's Exhibit                Introduced         Admitted

9           A                                9                 10

10          B                                9                 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (PROCEEDINGS BEGAN AT {} PM.)

 2

 3

 4

 5               (Proceedings commenced at 1:56 PM.)

 6               THE COURT:  The Court now calls Case No. 1:23-CR-020,

 7    United States of America versus Terrell Charles Fryar.

 8               MR. RANCOURT:  The United States is ready, Your Honor.

 9               THE COURT:  Thank you.

10               MR. HOAK:  Judge, we're not ready.  May I have one

11    moment with Mr. Fryar to speak with him?

12               THE COURT:  Yes, you may.

13               MR. HOAK:  And this is Ms. Montrano (ph) with my

14    office.  We'd ask the Court -- She's not entered as a matter of

15    record, but we'd ask that she be permitted to sit at the table.

16               THE COURT:  That would be fine.

17               MR. HOAK:  Thank you.

18               (Defense counsel consulted with his client off the

19    record from 1:57 PM until 2:00 PM after which the following

20    proceedings were held:)

21               MR. HOAK:  Thank you, Your Honor.

22               THE COURT:  All right.

23               All right.  And we're here today, Mr. Fryar, first of

24    all, for your arraignment.

25               And, Mr. Hoak, does your client wish to have the
```

1    Indictment read?

2          MR. HOAK:  No, Your Honor.  We've -- I've gone over it

3    with Mr. Fryar, the Indictment, and we would waive at this time.

4          THE COURT:  All right.

5          Mr. Rancourt, would you summarize the counts as against

6    Mr. Fryar?

7          MR. RANCOURT:  Yes, Your Honor.

8          Count One alleges that on or about a date unknown to

9    the Grand Jury and continuing through on or about the date of

10   this Indictment, in the Abilene Division of the Northern District

11   of Texas and elsewhere, Mr. Fryar, along with another

12   co-defendant, did combine, conspire, confederate and agree with

13   that person to knowingly and intentionally distribute and possess

14   with intent to distribute 50 grams and more of methamphetamine

15   (actual), a Schedule II controlled substance; in violation of

16   Title 21, United States Code, Sections 841(a)(1) and

17   841(b)(1)(A)(viii); all in violation of Title 21, United States

18   Code, Section 846.

19         Count Two alleges that on or about September 17th,

20   2022, in the Abilene Division, Mr. Fryar did intentionally and

21   knowingly possess with intent to distribute 50 grams and more of

22   methamphetamine (actual), a Schedule II controlled substance;

23   also in violation of Title 21, United States Code, Sections

24   841(a)(1), 841(b)(1)(A)(viii), Title 18, United States Code,

25   Section 2, and *Pinkerton v. United States*.

1           And as to Count Four, it's alleged that on or about

2 October 20th of 2022, in the Abilene Division of the Northern

3 District of Texas, the Defendant did intentionally and knowingly

4 possess with intent to distribute 50 grams or more -- and more of

5 methamphetamine (actual), a Schedule II controlled substance;

6 also in violation of Title 21, United States Code, Sections

7 841(a)(1), 841(b)(1)(A)(viii); Title 18, United States Code,

8 Section 2, and *Pinkerton v. United States*.

9           THE COURT:  Thank you, Mr. Rancourt.

10           Mr. Fryar, I assume you've had a chance to visit at

11 least briefly with your attorneys about the counts against you.

12           Is that correct?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  And based on those conversations, do you

15 feel today that you have a good general understanding of what the

16 charges are?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  All right.  I want you to listen next as

19 Mr. Rancourt explains the maximum punishments that can be imposed

20 on a person convicted of those charges.

21           MR. RANCOURT:  Yes, Your Honor.

22           Counts One, Two and Four all carry with it the same

23 potential punishment which is:

24           A term of imprisonment of not less than ten years and

25 up to life;

6

1          A fine of ten million dollars or both;

2          And a lifetime term of super -- or excuse me -- and a

3     term of supervised release of at least five years and up to life;

4          Therefore, the total maximum potential penalty is:

5          Life imprisonment;

6          A fine of 30 million dollars; and

7          A life term of supervised release following a term of

8     imprisonment;

9          Costs of incarceration and supervision;

10          Forfeiture of property; and

11          Restitution can be ordered for any victims of the

12    offense.

13          If the Defendant violates the conditions of supervised

14    release, he could be subject to additional terms of supervised

15    release and imprisonment as determined by the Court in accordance

16    with law.

17          The Defendant is also subject to a Mandatory Special

18    Assessment of $300 which is $100 per count.

19          THE COURT:  Thank you, Mr. Rancourt.

20          And, Mr. Fryar, do you feel that you understand the

21    maximum penalties that can be imposed on a person convicted of

22    these charges?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  All right.  Now having again heard and

25    understood the charges against you and the maximum punishment

1    that can be imposed, are you prepared to enter a plea today for

2    purposes of arraignment?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  And what is that plea?

5              THE DEFENDANT:  Not guilty.

6              THE COURT:  All right.  A plea of "not guilty" will be

7    entered as to all charges in the Indictment as against

8    Terrell Charles Fryar.

9              As required by Rule 5(f), the United States is ordered

10   to produce all exculpatory evidence to Mr. Fryar pursuant to

11   *Brady versus Maryland*.  Failing to do so in a timely manner may

12   result in sanctions, including exclusion of evidence, adverse

13   jury instructions, dismissal of charges, and contempt

14   proceedings.

15             Then that brings us to the next issue we'll discuss

16   which is your detention, Mr. Fryar.

17             As you know, I think Judge Bryant explained this to you

18   during your Initial Appearance on June the 29th.  The Government

19   here has filed a motion seeking to keep you in custody, pending

20   the resolution of your criminal case, and they base that motion

21   on their belief that if released, you would be both a flight risk

22   and a danger to other persons in the community.  But, again,

23   you're entitled to a hearing on that, and that's what we're here

24   about today.

25             And, Mr. Hoak, does your client wish to exercise his

1  right to that hearing?

2          MR. HOAK:  Yes, sir.

3          THE COURT:  All right.  So I see there is a presumption

4  that applies here, and let me just explain that to you a second,

5  Mr. Fryar.

6          Congress has determined that -- The statute that

7  applies to this proceeding today is called the "Bail Reform Act,"

8  and Congress, in passing the Bail Reform Act, determined that

9  certain crimes or certain crimes that people are charged with

10  carry with it a presumption that that person should be detained

11  in custody pending the outcome of their criminal case.

12          It's not an irrebuttable presumption.  It's a

13  rebuttable presumption which means you can present some evidence

14  that you're not a flight risk or a danger, and that will rebut

15  the presumption.

16          But Congress also decided that even if that presumption

17  is rebutted, that the presumption -- the fact that Congress

18  determined that it is a -- one of those cases that carries with

19  it a presumption of detention, I'm supposed to consider that as

20  one of the factors as I go forward.

21          Do you understand that?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  All right.  Now you are entitled to the

24  presumption of innocence.  Nothing that occurs here today,

25  including any findings that I make, shall be construed to affect

9

```
 1    that.  The question here today is simply:  Notwithstanding that

 2    presumption of innocence, should you be detained in custody

 3    because you're either a flight risk or a danger to other persons

 4    in the community.  That's the only issue we'll discuss today.  We

 5    will not be, obviously, discussing your guilt.

 6              Do you understand that?

 7              THE DEFENDANT:  Okay.  Yes, sir.

 8              THE COURT:  All right.

 9              Mr. Rancourt, are you prepared to call your first

10    witness?

11              MR. RANCOURT:  Yes, Your Honor.

12              I intend to present the Government's case here this

13    afternoon by way of proffer.

14              THE COURT:  Oh.  Go right ahead.

15              MR. RANCOURT:  Thank you, Your Honor.

16              Do you prefer that I stand at the lectern?

17              THE COURT:  The table is fine.  I'll let you sit at the

18    table.

19              MR. RANCOURT:  Thank you, Your Honor.

20              First, I think I've presented this to Ms. Chittum and

21    to Defense counsel, but at this time the Government offers

22    Government's Exhibits A and B.

23              THE COURT:  I just want to make sure they're marked.

24    Do we have them marked?

25              MR. RANCOURT:  They are marked, Your Honor, and I have
```

1    an extra copy of Exhibit B, if I may approach.

2          THE COURT:  All right.  I don't think mine are marked.

3    That's okay.  I can mark mine.

4          All right.  I have before me what's been marked as

5    Government's Exhibit A and B.

6          And, Mr. Hoak, any objection to the admission of these

7    exhibits for purposes of detention?

8          MR. HOAK:  No objection.

9          THE COURT:  All right.  Government's Exhibit A and B

10    are admitted for purposes of the Detention Hearing.

11          MR. RANCOURT:  Yes, Your Honor.

12          So to walk you through the basic facts of this case,

13    looking at Government's Exhibit A, starting on Page 1.  The pages

14    are labeled 1 through 12 in the bottom right-hand side corner.

15          On August 25th of 2022, a confidential source purchased

16    roughly $1200 of methamphetamine directly from the Defendant in

17    this case.  The facts of that controlled buy are laid out on

18    Pages 1 and 2.

19          I will represent that the DEA labs confirmed that

20    Mr. Fryar sold that confidential informant 111.54 net grams of

21    methamphetamine, a purity of which was approximately 75 percent.

22    And so it was an actual weight of about 83.65 grams.

23          Fast-forward -- And that was August 22nd, Your Honor,

24    of 2022.

25          Fast-forward to September 8th of 2022 and, again, a

1    confidential source ---

2            MR. HOAK:  All right, Judge.  We would ask the Marshals

3    to release the handcuffs so my client can assist me in taking

4    notes at this time for the purpose of the hearing only.

5            THE COURT:  That's fine.

6            Mr. Ferguson, would you remove his hand restraints?

7            MR. HOAK:  Thank you, Judge.

8            (Handcuffs removed from the Defendant by the Marshal

9    Service.)

10            THE COURT:  Go ahead, Mr. Rancourt.

11            MR. HOAK:  Thank you.

12            MR. RANCOURT:  Thank you, Your Honor.

13            So that was on August 25th of 2022.

14            Moving forward to Page 4 -- excuse me -- Page 5 of

15    Government's Exhibit A, it lays forth the police report alleging

16    that on September 8th of 2022, the Big Spring Police Department

17    again used a cooperating individual to purchase an amount of

18    methamphetamine directly from the Defendant.

19            The labs at the time it was purchased weighed or showed

20    the weight to be approximately 112 grams or roughly four ounces,

21    and the DEA labs confirm that that item was, in fact, 110.52 net

22    grams of methamphetamine hydrochloride that was 98 percent pure,

23    leaving a total actual weight of 103 grams of pure

24    methamphetamine.

25            Now roughly -- Excuse me.

1          A week later, moving to Page 7 of 12, after the second

2    controlled buy, the Big Spring Police Department obtained and

3    secured a search warrant for a tracker on the Defendant's

4    vehicle.  During that time, they tracked him to Fort Worth.  They

5    believed he was going to pick up methamphetamine.  As he was

6    returning on I-20, they notified the police in Colorado City.

7    Colorado City executed a traffic stop on September 16th on

8    Mr. Fryar's vehicle.  Mr. Fryar was operating that vehicle.

9          And the subsequent search of that vehicle revealed

10   roughly 1.8 kilograms of methamphetamine.  The lab results for

11   that methamphetamine had returned, and the DEA confirms that the

12   methamphetamine found in Mr. Fryar's vehicle was 1,861 net grams

13   of methamphetamine hydrochloride that was 99 percent pure.  So

14   that's September 16th and September 17 of 2022.

15         As the Government noted in its sealed Supplemental

16   Motion for Pretrial Detention, there is a -- at least -- I would

17   concede that Mr. Fryar may have had a subjective belief that

18   after September 17th, he may or may not have been ---

19         THE COURT:  Let me ask you this:  Do we need to close

20   the courtroom or who is the person back here in the ---

21         MR. HOAK:  Thank you, Judge.  We would ask the

22   courtroom to be closed.  At the relevant time I was going to

23   approach the bench, but I ---

24         THE COURT:  Well, this may be the relevant time.

25         MR. HOAK:  Okay.

1          THE COURT:  I assume this is your Case Agent?

2          MR. RANCOURT:  Yes, Your Honor.

3          THE COURT:  And who is this -- Is this woman with you?

4          MR. HOAK:  Yeah.  She's an attorney with our office.

5          THE COURT:  All right.

6          MR. HOAK:  And that's Ms. Ranasowis (ph).  She's a

7   paralegal with our office.

8          THE COURT:  All right.  And that's the one I was

9   referring to.

10          MR. HOAK:  Yes, sir.

11          THE COURT:  So for the record, there's no one currently

12   in the courtroom other than the parties and their attorneys, the

13   Case Agent, and the staff with your office and then, of course,

14   Marshal Service staff and court staff.  So I think it's

15   unnecessary to close the courtroom.  But if somebody walks in,

16   we'll try to catch that as quickly as we can.

17          So go ahead.

18          MR. RANCOURT:  Yes, Your Honor.  Thank you.  And I

19   apologize for not bringing it to the Court's attention.

20          THE COURT:  That's fine.

21          MR. RANCOURT:  But after September 17th, 2022, the

22   Government concedes that the Defendant may have had his own

23   subjective belief that he may have been working or was going to

24   potentially work as a cooperator with the DEA.

25          Now the DEA informs me they never signed him up to be a

1    confidential source.  The Big Spring Police Department may have

2    signed him up as a confidential source but did not utilize him.

3         And during that time, it is -- the Government alleges

4    in Count Four that the Defendant executed or was caught with

5    additional methamphetamine.

6         For the purposes of this hearing only, Your Honor, I'm

7    asking the Court not to consider that arrest in October of 2022

8    where the Defendant was caught with roughly one pound of

9    methamphetamine.  And the -- the basics of that charge are --

10   form the basis of Count Four of the Indictment where he was

11   caught on October 20th of 2022.

12        THE COURT:  All right.  Does the -- I assume the

13   Government's exhibit at some point has an incident or a narrative

14   report on that arrest?

15        MR. RANCOURT:  Not in Government's A and B, Your Honor.

16        THE COURT:  Okay.  So -- So all the information I have

17   in A and B is -- excludes the -- the -- any activity during which

18   he may have harbored this subjective belief.

19        MR. RANCOURT:  Correct, Your Honor.  And I only bring

20   it to the Court's attention because Count Four is an additional

21   basis for potential detention.

22        THE COURT:  All right.

23        MR. RANCOURT:  Let's -- Moving forward then, the

24   Defendant is indicted, and he is arrested on June 20th of 2022 in

25   Big Spring, Texas.  The police report surrounding that arrest is

1    all laid out in Government's Exhibit B.

2         Now after learning about this arrest and talking with

3    both the Case Agent and my colleague who is the -- the point AUSA

4    on this case, I reached out to the Agent this morning, notifying

5    him that I needed a copy of the arrest report surrounding the

6    arrest of the Defendant on June 20th.  I obtained it at roughly

7    10:30 this morning.  As soon as I got here today, I provided --

8    Ms. Chittum was kind enough to print out copies.  I provided it

9    to counsel.  It includes all 30-like pages of the police report,

10   but I would like to direct the Court's attention really to Pages

11   8 and 9 regarding that arrest.

12        And the Government alleges that on June 20th, 2023,

13   when it had belief that Mr. Fryar was staying at a motel room in

14   Big Spring, Texas, that they went to go effectuate that arrest.

15        MR. HOAK:  Judge, objection.  We're -- The AUSA

16   tendered and proffered me that recent report which he's alluding

17   to now as to that arrest period.  I got that right before the

18   hearing.  It's a 20-page document.  We did not have that report

19   or have not looked at the report or discussed it with our client.

20        I believe it's not a surprise tactic, but we were

21   surprised; that it put us at an advantageous position to prepare

22   for this hearing today, and we ask the Court to either not allow

23   it to be admitted or heard or the Court to consider that report.

24        THE COURT:  You're asking me not to consider it?

25        What I'll do is I'll allow you, if you need it, time to

 1    read the report, but I'm going to consider the report for

 2    purposes of detention only.

 3          So the only question is:  How much time do you need to

 4    review it and go over it with your client?

 5          MR. HOAK:  A few moments.

 6          THE COURT:  A few moments, all right.  You need that

 7    now or you going to ---

 8          MR. HOAK:  Yes, sir.

 9          THE COURT:  Mr. Rancourt, I hate to interrupt your

10    presentation, but I think in all fairness to Mr. Fryar, I'm going

11    to give him and his attorney a chance to take a look at this

12    report.

13          We will stand in recess for a few moments.

14          MR. RANCOURT:  Your Honor, if I may?

15          THE COURT:  Yes.

16          MR. RANCOURT:  The only two pages I intend on directing

17    the Court to are Pages 9 and 10.  Out of an abundance of caution,

18    I provided the entire report because I was not here to curiate

19    it.

20          THE COURT:  All right.  So listen, Mr. Hoak:  This is

21    the import of that.  Although the Government has offered and I

22    have admitted Government's Exhibit B for purpose of this

23    Detention Hearing, the Court will only consider Pages 8 and 9 of

24    that report.  All right?

25          So I will grant your objection to the extent of the

1  rest of the report, but I will consider 8 and 9 if that helps

2  focus your conversation with your client.

3          MR. HOAK:  But you will not grant my objection,

4  Your Honor, insofar as the entire report itself?  The Court's

5  going to consider Page 8 and 9.

6          THE COURT:  I will consider Page 8 and 9.  I won't

7  consider the remainder of the report.  If the only basis of the

8  objection is you haven't had time to consider it, I'm giving you

9  time to consider it.

10         MR. HOAK:  Oh, we haven't had time to read it, Judge,

11  but I understand the -- We haven't had time to investigate it.

12         THE COURT:  Well, I mean this is a Detention Hearing.

13  I mean I'll give you time to read it and discuss it with your

14  client, and you can make whatever arguments you want to make.

15  The Rules of Evidence don't apply here, anyway.  So I think

16  giving you an opportunity to -- to read it, consider it, talk to

17  your client about it, and then make whatever argument you want to

18  make -- Counsel for the Government says he's only had it as of

19  today.  So, you know, I'll use it for what it's worth, but I

20  don't know how much time you need.

21         Is there -- Is there a basis for the objection other

22  than not having time to go over it with your client?  Because I'm

23  giving you that.

24         MR. HOAK:  No, sir.

25         THE COURT:  All right.  Let's do that.

1        (Defense counsel consulted with his client off the

2   record from 2:19 PM until 2:22 PM.)

3        MR. HOAK:  Thank you, Judge.  We're ready.

4        THE COURT:  Thank you, Mr. Hoak.

5        And, Mr. Rancourt, you may proceed.  You were in the

6   middle of discussing Government's Exhibit B, Pages 8 and 9.

7        MR. RANCOURT:  Yes, Your Honor.

8        Before I get to the events of June 20th, 2023, as I

9   mentioned -- I'll note no one else has come into the courtroom

10  since the Court made the record previously regarding the

11  cooperation -- is that there were text messages between this

12  Defendant and DEA.  Those ceased in the Fall of 2022.  I can

13  absolutely represent to the Court there was no communication

14  between Mr. Fryar and the DEA at any time during 2023.

15       So moving to June 20th of 2023, Big Spring police

16  officers go to effectuate the arrest of Mr. Fryar.  They have

17  reason to believe that he is at a motel room in Big Spring,

18  Texas.

19       When they attempt to make contact with the Defendant at

20  that room, they see Mr. Fryar exit through the window of the

21  motel room.  He then leads the police on a foot chase where they

22  end up tackling him, and he is taken into custody approximately

23  100 feet away from the Comfort Inn where he was staying.

24       Now they searched him incident to arrest and found what

25  appears to be a user amount of methamphetamine.  And at that time

1    he spoke with the agents.  And agents entered the room to conduct

2    a sweep, saw an AR-15-style rifle in plain view.  They then went

3    to go get a state search warrant and obtained that firearm.  It

4    was an AR-style rifle that was behind the bed.

5             They also found a user amount of methamphetamine as

6    well as two digital scales, a black .357 Magnum Taurus revolver.

7             During his arrest, Mr. Fryar informed the Big Spring

8    police officers that he had an automatic AR-15-style weapon in

9    the room.  I conferred with the Case Agent who spoke with Big

10   Spring PD this morning and can proffer to the Court that the Big

11   Spring Police Department did, in fact, test that AR-15-style

12   weapon, and it does shoot more than one round with a single pull

13   of the trigger, thereby meeting the definition of a "machine gun"

14   under federal law.

15            It has not been tested by the ATF.  I would expect

16   that -- request that the ATF take custody of that firearm to

17   confirm it is, in fact, a machine gun.  But Mr. Fryar has

18   represented it is a machine gun and the Big Spring Police

19   Department has confirmed, and it believes it to meet the elements

20   of it being a machine gun.

21            So that is all I have, Your Honor.  I don't know if

22   Your Honor proceeds this way, but I would also ask you to take

23   judicial notice of the Bond Report filed in this case.

24            THE COURT:  All right.  Any objection to me noticing

25   the Bond Report?

1          MR. HOAK:  The bond what, Your Honor?

2          THE COURT:  The Bond Report, the Pretrial Bond Report.

3          MR. HOAK:  No, sir.

4          THE COURT:  All right.  The Court will take

5     consideration of the Pretrial Bond Report for purposes of

6     detention.

7          Thank you, Mr. Rancourt.

8          All right.  Mr. Hoak, do you have any evidence or

9     proffer you'd like the Court to consider?

10         MR. HOAK:  I'd like to call the young DEA agent in the

11    court today, I think representing the DEA, to the stand.

12         THE COURT:  That's fine.

13         You may come forward.

14         MR. RANCOURT:  Your Honor, if I may.

15         Because the Defense is calling the Case Agent, my

16    understanding is that the *Giglio* is not implicated in this case.

17         THE COURT:  Do you solemnly swear or affirm that the

18    testimony you'll give today before this Court is the truth, the

19    whole truth, and nothing but the truth, so help you God?

20         THE WITNESS:  Yes, I do.

21         THE COURT:  Please be seated.

22         Mr. Hoak, let's just make sure this isn't a discovery

23    exercise.  It has to bear on flight or danger.

24         MR. HOAK:  Thank you, Judge.

25

```
 1                     DIRECT EXAMINATION

 2   QUESTIONS BY MR. HOAK:

 3   Q.    State your name, please.

 4   A.    Special Agent Dylan Frantz from Lubbock DEA.

 5   Q.    And you're currently employed with DEA?

 6   A.    Yes, sir.

 7   Q.    Which office?

 8   A.    Lubbock Resident Office in Lubbock, Texas.

 9   Q.    And are you the Agent-in-Chief on this case, the prosecution

10   of Mr. Fryar?

11   A.    I am the Case Agent, yes, sir.

12   Q.    And you guys picked up this case from Big Springs Police

13   Department, didn't you, basically?

14   A.    Yes, sir.

15   Q.    Okay.  And were you aware, prior to your involvement, of

16   Mr. Fryar being a cooperating informant with any local law

17   enforcement or county or state law enforcement agency before the

18   Federal Government's involvement?

19   A.    I don't understand your question.  Can you repeat it?

20   Q.    Did you discuss any -- There's been some written reports

21   submitted to the Court today for considerations of release.

22   You've read those reports written by the Big Springs Police

23   Department, haven't you?

24   A.    Yes, sir.  I initially found out that they had bought two

25   separate buys with Big -- Big Spring CIs and then they presented
```

1    that information to me.  Yes, sir.

2    Q.   Did they ever represent to you that, in fact, my client,

3    Mr. Fryar, was an informant for their law enforcement agency?

4    A.   No, sir.  They -- They advised that they made purchases from

5    Terrell Fryar.

6    Q.   Have you had much contact and communication with the Big

7    Springs Police Department prior to Mr. Fryar's arrest?

8    A.   Which arrest, sir?

9    Q.   The -- The most recent one on the federal case.

10   A.   Yes.  We spoke, sir.

11   Q.   Did they in any way tell you or allude to you that the

12   firearms that were purportedly taken from Mr. Fryar on the date

13   of his arrest, that, in fact, they had been working with

14   Mr. Fryar in his -- his capacity as a confidential informant and

15   had requested of Mr. Fryar that he purchase or find weapons for

16   their department?

17   A.   No, sir, they did not.

18   Q.   Have you worked with any of those agents before?  Any of

19   those law enforcement?

20   A.   Yes, sir.

21   Q.   And none of those agents are in court today to testify as

22   for purposes of detention on the facts that they -- given by the

23   U.S. Attorney in those police reports that have been entered

24   today.  There's -- There's no local officers in here testifying

25   to those facts, are there?

```
 1   A.   No, sir.

 2   Q.   You weren't there, were you?

 3   A.   Not during the arrest, no, sir.

 4   Q.   Okay.  Now Mr. Fryar had been out initially.  The chronology

 5   of this case, he's being stopped and arrested by Big Springs

 6   Police Department.  Is that your understanding?

 7   A.   Yes, sir.

 8   Q.   And he was -- And that really went on for about a year,

 9   didn't it?

10   A.   Yes, sir.

11   Q.   And can you -- And you've seen some of their work, haven't

12   you?  Some of their investigative reports that they filed,

13   you've -- you've seen those, haven't you?

14   A.   Yes, sir.

15   Q.   And then on one of the initial stops over a year ago in

16   which they state that Mr. Fryar had a kilo on him, it states in

17   the report they released him.  Is that basically your

18   understanding of that report?

19   A.   Yes, they did release him.

20   Q.   Do you find that common or unusual at all that they would

21   stop somebody and -- and -- and confiscate a kilo of

22   methamphetamine and -- and take the drugs and let him go?

23   A.   Yes.  From my prior experiences, I have seen that to be

24   common practice.

25   Q.   How often?
```

1   A.   It just -- It would depend on who made the traffic stop.

2   Q.   Well, I can represent to you, Officer, I've done this 40

3   years, and that's about the first time I've ever seen that one.

4        Don't they usually take you down on a state charge and --

5   and -- and -- and have you -- and charge you on a state case?  On

6   a state charge and then have you post bond?

7   A.   It would depend on the department, if they're working with a

8   federal agency, to see if they wanted to pursue the charges

9   federally.  It would be up to their department on how they

10  handled that, sir.

11  Q.   Are you saying you had contact with that department, Big

12  Springs Department, as long as a year ago?

13  A.   I was made aware of the traffic stop by my Co-Case Agent and

14  the traffic -- the people that conducted the traffic stop at Big

15  Spring Police Department.

16  Q.   Well, in acknowledging to the Court that you have seen some

17  of the police reports, investigative reports by Big Springs

18  Police Department, did you read the one when Mr. Fryar goes to

19  the Big Springs Department with a significant amount of dope and

20  gives it to them?

21       Wouldn't that lend some credibility and substance that he's

22  in a working capacity as an informant when he takes dope right to

23  the Police Department?  Did that raise a red flag for you?

24  A.   I did see that he brought that to them, and they eventually

25  did sign him up as an informant at some point.

1    Q.    Do you believe ---

2    A.    Whatever they did with those -- with that forward, we didn't

3    have him signed up.  So he wasn't under our direction.

4    Q.    Did they acknowledge to you they had signed him up?

5    A.    Yes.  I -- Off the top of my head, I don't know the date and

6    time.

7    Q.    That is a "yes"?  That's your testimony?  They had signed

8    him up?

9    A.    I believe so in the October timeframe.  I don't know the

10   exact time, and this was after the traffic stop and the two buys.

11   Q.    So it sounds to me, and I don't know about the Court, that

12   there is a working capacity with Mr. Fryar and law enforcement

13   agencies at the local, county, maybe state level, prior to your

14   involvement.  There's -- There's -- He's working as a CI.

15       Doesn't that sound like that to you?

16   A.    I believe it all came to fruition after he had been stopped

17   with the 1.8 kilos and the two UC buys and then the additional

18   one pound, yes, sir.

19   Q.    So conceivably, without your knowledge, Officer, there could

20   have been a continued relationship there throughout this year

21   during your investigation of Mr. Fryar.  He could have had in the

22   very least a reasonable belief that he was working with or in

23   cooperation with a law enforcement agency.

24       That's a fair statement, isn't it?

25   A.    I don't know what his relationship was with Big Spring

1    Police Department.  I -- They never reached out to us saying that

2    they were going to make a buy or do anything with his

3    cooperation.  So I don't know what their relationship was.

4    Q.   Is it your understanding, with your involvement in the

5    federal investigation, that Mr. Fryar's a U.S. citizen?

6    A.   Yes.

7    Q.   That's not -- That's not a contest in any way, an issue with

8    the Court; is it?

9    A.   No, sir.

10    Q.   Is it your understanding that he's really been a life-long

11    resident in the community of Big Springs and the jurisdiction of

12    this federal circuit?

13    A.   Yes, sir.

14    Q.   You've had a chance to look over his prior criminal history,

15    haven't you?

16    A.   Yes, sir.

17    Q.   Do you think there's been a guardian agent -- angel looking

18    over Mr. Fryar for all these years?

19         And to be specific, there's a lot of criminal history, and

20    they all end up getting dismissed other than a purported or, in

21    fact, a conviction for first escaping and thereafter he -- a

22    federal drug offense that he did time for.  All the other charges

23    seem to be dismissed.

24         Did you notice that?

25    A.   I didn't notice the disposition on the evading arrest, if

1    that's what you're asking, but I did -- yes, I did see that he

2    had other involvement with law enforcement where he was either

3    evading or failure to appear.

4    Q.    And in your experience as a law enforcement officer, federal

5    officer, when you see a criminal history like that with a bunch

6    of dismissals on what could be or not significant charges and you

7    constantly see them dismissed, does that ever provoke a thought

8    in your mind as an experienced investigator?

9    A.    I couldn't tell you.  I'd have to reach out to the

10   prosecutor in that county and figure out what -- what the problem

11   was.  So I can't answer that.

12   Q.    We don't know, you don't know, the Court doesn't know -- of

13   course, I'm going to address it -- but you don't know the

14   specific circumstances of that escape charge that's alluded to in

15   his criminal history in the PSR.  You don't know those

16   circumstances, do you?

17   A.    No, sir.

18           MR. HOAK:  One moment, Judge, if it please the Court.

19           (Pause)

20   Q     (By Mr. Hoak) Is it true or not true that two days after the

21   first stop that's the basis of the federal indictment, that

22   you -- Mr. Fryar, my client, was taken into a law enforcement

23   center in addition to -- Is it true or not true that within two

24   days of the first stop of Mr. Fryar that's the basis in the first

25   count of the -- your federal indictment that you had contact with

1    Mr. Fryar?  Is that true or not true?

2    A.   Yes.  We interviewed him at the Big Spring Police

3    Department.

4    Q.   And he, in fact, brought you drugs, didn't he?  Is that true

5    or not true?

6    A.   He brought it and released the custody to -- that would be

7    Sergeant Ramirez with the Big Spring Police Department, and then

8    I took custody of it to the DEA lab.  Yes, sir.

9    Q.   So you personally observed and witnessed the Defendant

10   bringing either you or a Big Springs detective, bringing you dope

11   to the Police Station.

12        Certainly, doesn't that evidence a -- a CI -- a working

13   relationship with either your agency and/or Big Springs Police

14   Department?

15   A.   I believe he was -- The day that he was stopped with the 1.8

16   kilograms, they interviewed him roadside, and he agreed to

17   cooperate at that point with them, and then he agreed to come in

18   and talk with DEA at that point.  So that's why we showed up, to

19   talk to him, because he had information that he was giving

20   willingly, yes, sir.

21   Q.   Was there an ATF Agent involved in that debriefing or

22   interview, also?

23   A.   No, sir.

24   Q.   Okay.

25             MR. HOAK:  Judge, I'm not going to belabor, take more

1  time from the Court.  You've been real generous.  I could prove

2  up some other issues through the Agent for matter of record on

3  what I'm going to argue on release, but I'm not going to do that.

4  I'm going to just -- Rather, I think the Court would appreciate

5  it more if I just proffer it to the Court and argue it.

6           THE COURT:  All right.

7           Mr. Rancourt, any examination of this witness?

8           MR. RANCOURT:  Yes, Your Honor, briefly.

9                    CROSS EXAMINATION

10 QUESTIONS BY MR. RANCOURT:

11 Q.   Agent Frantz, to your knowledge, was the Defendant acting as

12 a confidential informant on August 25th of 2022?

13 A.   No, sir.

14 Q.   Was he acting as a confidential informant on September 8th

15 of 2022?

16 A.   No, sir.

17 Q.   The Government alleges in both of those instances that you

18 or the Big Spring Police Department utilized a confidential

19 source to conduct a controlled buy, correct?

20 A.   Correct.

21 Q.   Why would you want to use a confidential informant to

22 purchase methamphetamine from another confidential informant?

23 A.   You wouldn't.

24 Q.   Now after the September 8th, 2022, controlled buy, the State

25 obtained a search warrant for a tracker on the Defendant's

```
 1  vehicle; correct?

 2  A.   Yes, sir.

 3  Q.   Why would you need to obtain a tracker on a confidential

 4  source's vehicle?

 5  A.   You wouldn't need to.  You would put a tracker on someone

 6  that you were targeting.

 7  Q.   And when the Defendant was caught with over 1800 net grams

 8  of methamphetamine on September 16th, 2022, to your knowledge,

 9  was he acting as a confidential informant either for the DEA or a

10  state agency?

11  A.   No, sir.

12         MR. HOAK:  I'll ---

13         THE COURT:  Yes?

14         MR. HOAK:  No, no objection, Judge.

15  Q    (By Mr. Rancourt) Was the Defendant acting as a confidential

16  informant for either a federal or state agency, to your

17  knowledge, on June 20th of 2023?

18  A.   No, sir.

19  Q.   To your knowledge, has the Defendant assisted in purchasing

20  any firearms on behalf of the DEA?

21  A.   No, sir.

22  Q.   Have you been involved in controlled purchases of firearms

23  before?

24  A.   Yes, sir.

25  Q.   When you do a controlled purchase of a firearm, do you
```

1 typically allow the confidential source to bring it back to their

2 residence?

3 A. No, sir.

4 Q. All right.  And why is that?

5 A. That would not be a good practice to do.  You don't know if

6 -- whose or when it was in their possession, or you wouldn't be

7 able to control exactly where they got the firearm from.

8 Q. And it's alleged that the Defendant fled from law

9 enforcement on June 20th of 2023, correct?

10 A. Yes, sir.

11 Q. If an individual is working as a confidential informant for

12 the police, what incentive would they have to flee the police?

13 A. There would be no incentive to run from the police that have

14 marked uniforms and telling him to stop and don't run.

15 Q. And when did communications cease between the DEA and

16 Mr. Fryar?

17 A. It was approximately the October timeframe, 2022.

18   MR. RANCOURT:  No further questions, Your Honor.

19   THE COURT:  Thank you.

20   Any Recross?

21   MR. HOAK:  No, sir.

22   THE COURT:  You may step down.  Thank you, sir.

23   THE WITNESS:  Thank you, sir.

24   THE COURT:  Any further proffer, Mr. Hoak?

25   MR. HOAK:  No.  Just argument or addressing the Court.

1          THE COURT:  Sure.

2          Mr. Rancourt, would you like to argue?

3          MR. RANCOURT:  For about 60 seconds, Your Honor.

4          THE COURT:  Take 61, if you need them.

5          MR. RANCOURT:  Yes, Your Honor.

6          Just looking at the detention factors, the weight of

7   the evidence against this individual with regard to the facts as

8   they were laid out in the Indictment and as to Count Two for that

9   September 17th, 2022, traffic stop, forming the basis of Count

10  Two is strong.

11          I'll note for his criminal history as it relates to a

12  flight risk, he had been sentenced to a probation charge in 2005.

13  That was revoked.

14          He has an escape conviction for which he received six

15  years in custody.  That was back in 2007.  And roughly around

16  that same time, was sentenced originally in federal court for

17  conspiracy to manufacture methamphetamine to 151 months that in

18  2015 was reduced to 92 months.

19          In addition to the controlled purchase, Your Honor, and

20  the traffic stop yielding over 1800 grams of methamphetamine,

21  what should be most concerning to this Court as it relates to

22  danger is when Mr. Fryar's arrested.  Not only does he flee,

23  which is consistent with his criminal history, but he admits that

24  there's a machine gun in his -- in his residence or at the time a

25  hotel room or motel room that contained a user amount of

1  methamphetamine but also digital scales which would be indicative

2  of drug trafficking as well as the tools of the trade, being a

3  .357 revolver and a machine gun that has now been tested, and at

4  least preliminary reports indicate that it is, in fact, a machine

5  gun.

6          So for those reasons, we believe that he is not only a

7  danger to the community but he's also a flight risk, and we ask

8  that he be detained on both of those bases.

9          THE COURT:  All right.  Thank you, Mr. Rancourt.

10         And Mr. Hoak?

11         MR. HOAK:  If it please the Court.

12         Defendant's a life-long resident of Big Springs;

13 resident of this circuit, always has lived here; has family here.

14         In his criminal history there is a, I believe, 10 or 13

15 years ago in the state a conviction.  I can't put on evidence for

16 the Court.  I understand just from talking with my client that

17 was a "walk away," you know.  He's in state court and the Judge

18 says, "You know where Probation is," and he takes off.  That was

19 a long time ago, years ago.

20         I think Mr. Fryar's acknowledged the drug issue.  My

21 understanding, he was doing well for about eight years post his

22 supervised release on his last federal conviction, and his life

23 changed.  I would represent to the Court that related directly

24 with his using methamphetamine again.

25         At this time he's represented with a prior lawyer that

1    he is not employed.  He has a long history of being able to

2    obtain and gain employment.  And we would represent to the Court,

3    if it saw that we had overcome the rebuttable presumption, that

4    he could quickly find suitable employment, and our office would

5    help him do that and even require it.

6         He has a brother that's a life-long resident in this

7    county, in this circuit that perhaps is willing -- I'm not going

8    to represent to the Court he is -- is perhaps willing to allow

9    Mr. Fryar to reside with him.

10        I have a real concern, Judge.  These are triable

11   issues.  I've done this a long time.  We have state involvement

12   and even by the testimony of the agent that testified today of

13   prior statuses as a confidential informant and at the very least

14   the reasonable belief that maybe you were.  I think there was an

15   acknowledgment he was at the state level.

16        THE COURT:  I'm unclear what relevance that has to my

17   decision today.

18        MR. HOAK:  I'm just addressing the Court, Judge, on

19   things.  We're -- We're going to ask that with conditions, the

20   Court can find he's not a ---

21        THE COURT:  Yeah.  But even if I assume that he's

22   currently cooperating with the Government, I'm not a pawn for the

23   Government.  If he's doing something that I think is dangerous to

24   the community, I don't care if he's cooperating with the

25   Government or not.  I -- I'm going to apply the standards that

1  Congress gave me to apply under the statute.  And if I think

2  there are no conditions or a combination of conditions I can

3  impose that will reasonably assure the safety of the community, I

4  don't care who he's cooperating with.

5          MR. HOAK:  I understand.

6          THE COURT:  Right?

7          MR. HOAK:  Yes.

8          THE COURT:  I mean you agree, right?

9          MR. HOAK:  Yes.  Yes, I do.

10          THE COURT:  I mean I'm obligated if I find that he is a

11  danger to the community, even if he is working with an agent --

12          MR. HOAK:  Absolutely.

13          THE COURT:  -- who gives him an automatic machine gun.

14  That doesn't mean the Court has to turn a blind eye to that,

15  right?

16          MR. HOAK:  That's correct.

17          THE COURT:  That's correct.

18          MR. HOAK:  Yes.

19          THE COURT:  Okay.  So even if he's -- he's out there

20  engaged in drug trafficking, that's fine for the agent to have an

21  agreement with him.  He has no agreement with the Court; right?

22          MR. HOAK:  Right.

23          THE COURT:  My agreement is with the public to apply

24  the law.

25          MR. HOAK:  Right.

1          THE COURT:  Not with the Government, not with anyone

2     else.

3          So if you can explain to me how I can faithfully apply

4     the standards of the Bail Reform Act and release him, I'm all

5     ears.

6          MR. HOAK:  We believe, Judge, that with conditions that

7     the Court could impose, he would not be a danger to the community

8     and would not flee.  We could have daily drug testing.  We could

9     have monitors on him.  And then he ---

10         THE COURT:  Daily drug testing and monitors won't

11    prevent a drug trafficker from drug trafficking.  You and I both

12    know that, if you've been doing this this long, because I've been

13    doing it a long time, too.

14         MR. HOAK:  I know you have, Judge.

15         THE COURT:  And daily monitoring and ankle monitors,

16    all that won't prevent a person from obtaining a weapon and using

17    it.  We both know that.

18         So I'm still listening for a reasonable basis upon

19    which I could say, "I can set these conditions and everybody's

20    going to be okay."

21         MR. HOAK:  Nothing further, Your Honor.

22         THE COURT:  All right.  Thank you.

23         I do find that the rebuttable presumption here applies

24    because Mr. Fryar has been indicted by a Grand Jury for a

25    qualifying offense.  Even if I decide that Mr. Fryar sufficiently

 1    rebutted the presumption, it remains with the case as a factor

 2    that I consider, as I explained, as one of the factors that

 3    Congress gave me to take into consideration, and I do carry that

 4    factor with the case.

 5           I look at the four statutory factors required by the

 6    Bail Reform Act.

 7           Specifically, the nature and circumstances of the

 8    offense charged, including whether it's a -- involves a

 9    controlled substance offense which this, obviously, does.

10           And I also take into consideration the legislative

11    history of the Bail Reform Act reflects that the term "danger" is

12    to be interpreted broadly beyond just physical violence but

13    intended to capture continued -- continued criminal activity,

14    including drug trafficking.

15           So the nature and circumstance of the offense here is a

16    serious offense.  And, again, I'm -- I'm limiting my analysis of

17    this to the arrest of August -- the incidents of August and

18    September of 2022.

19           I'm also looking at the second statutory factor which

20    is the weight of the evidence.  The weight of the evidence in

21    this case is quite strong as they typically are in federal

22    investigations.  So that's not unusual.

23           The third factor is the history and characteristics of

24    the person before me, Mr. Fryar, and there are several

25    subcategories under that, including Mr. Fryar's personal

1    character, evidence of his usual behavior.  In other words, is he

2    a rule follower or not?

3         I don't have a whole lot of evidence of Mr. Fryar's

4    usual behavior or rule-following propensities other than what's

5    contained in the Bond Report.  Those do not reflect well on

6    Mr. Fryar.

7         The second subfactor is Mr. Fryar's physical and mental

8    condition.  Mr. Fryar does not appear to have any physical or

9    mental condition that would make him a flight risk or a danger.

10   So that weighs in his favor.

11        Family ties to the area, and this is family ties as

12   they are relevant to flight and danger.  Although the Bond Report

13   references his brother, I can't tell from the Bond Report that

14   there's a close relationship there, such that his brother could

15   influence Mr. Fryar to not fly -- flee or be a danger to another

16   person in the community.  But I will -- I will give that

17   Mr. Fryar has been a lifetime resident of Big Spring and does

18   have a -- I'll assume he has a supportive brother.

19        The next factor is Mr. Fryar's employment.  He has been

20   unemployed for a couple of years.  Although he -- counsel

21   represents that he could quickly obtain employment, that looks

22   doubtful at this point.  So that does not count in Mr. Fryar's

23   favor.

24        Mr. Fryar's financial resources seem to be kind of a

25   question mark, quite frankly.  There's some royalties, I

1  understand, and some other resources but none of it comes from a

2  job that I can see.

3          Length of residence in the community, I said that

4  weighs in his favor.

5          Community ties, although a lifetime resident, there

6  don't seem to be or I haven't received any evidence of

7  significant community ties.

8          Past conduct does not weigh in Mr. Fryar's favor.

9          History of drug and alcohol abuse also does not weigh

10  in Mr. Fryar's favor.

11          And here again, I cite the legislative history of the

12  Bail Reform Act and the empirical studies showing that there is a

13  correlation between drug use and failure to appear and pretrial

14  re-arrest.

15          The next factor is Mr. Fryar's criminal history which

16  is significant.  While some of it is old, there is a disturbing

17  pattern of evading, bail jumping, failure to appear, escaping,

18  revocations.  So none of that reflects well on Mr. Fryar.

19          And the last factor is the nature and seriousness of

20  the danger imposed to the community if I release Mr. Fryar.

21  Mr. Fryar, who the evidence before me shows that notwithstanding

22  multiple prior arrests, was discovered in June apparently engaged

23  in drug trafficking with a weapon that the evidence is --

24  suggests is a fully automatic weapon or any weapon; any weapon.

25  And to think that that is not a danger to the community is

 1    insanity.

 2           So I do find that, based upon all the factors that

 3    Congress has given me to consider under the Bail Reform Act, that

 4    the Government has successfully carried its burden to establish

 5    that there are no conditions that the Court can impose to

 6    reasonably ensure Mr. Fryar's appearance at future proceedings.

 7           By a preponderance and by clear and convincing

 8    evidence, I'm going to find that the Government has established

 9    that there is no condition or combination of conditions that I

10    could impose that would reasonably assure the safety of the

11    community.

12           On that basis, the Government's motion is granted.

13           Anything further from the Government?

14           MR. RANCOURT:  No, Judge.

15           THE COURT:  Mr. Hoak?

16           MR. HOAK:  No, sir.

17           THE COURT:  Mr. Fryar, you'll remain in custody.

18           We're adjourned.  Thank you.

19           (Hearing adjourned at 2:57 PM.)

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the electronically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of June, 2024.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER